IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DERRICK G. RAGAN, : | |
| Petitioner, : | |
| : | CIVIL ACTION |
| v. : | No. 00-2092 |
| : | |
| MARTIN HORN, et al., : | |
| Respondents. : | |

March 6, 2008                                                                                           Anita B. Brody, J.

**MEMORANDUM AND ORDER**

**I.      Background**

In 1991, Petitioner Derrick Ragan ("Ragan" or "Petitioner") was convicted of two homicides in Pennsylvania state court, one committed on June 15, 1990, and the other committed on June 26, 1990. P-1.¹ For the first conviction, Ragan was sentenced to life in prison (the "life" case).² Id. For the second conviction, Ragan received the death penalty (the "death" case).³ Id. The life conviction was the sole aggravating factor used to impose a sentence of death.

On May 25, 1994, the Pennsylvania Superior Court on direct appeal affirmed Ragan's life conviction, and on October 24, 1994, the Pennsylvania Supreme Court denied allocatur. P-1. On December 10, 1996, Ragan filed a Post-Conviction Relief Act ("PCRA") petition. Id. On June 9, 1997, the Court of Common Pleas dismissed the petition, and on November 12, 1998, the Superior

---

¹       "P-" refers to exhibits presented by Petitioner at the March 13, 2007 evidentiary hearing.

²       At the trial for this murder, Ragan was represented by attorney Harry Seay. P-1.

³       At the trial for this murder, Ragan was represented by attorney Nino Tinari. P-1.

Court affirmed the dismissal. Id. Also on November 12, 1998, Ragan filed a pro se allocatur petition on the life conviction in the Pennsylvania Supreme Court. Id. The death conviction had not yet been directly appealed as of that date. Id.

Ragan's mother, Inez ("Mrs. Ragan"), thought her son should get a new lawyer before proceeding any further.[4] So, on December 23, 1998, she visited noted Philadelphia defense attorney Fortunato Perri ("Perri"). FF ¶ 1.[5] At that meeting, Perri agreed to file an amended allocatur petition in the life case and a direct appeal in the death case. Id.; P-6. Mrs. Ragan agreed to pay Perri periodically by check. FF ¶¶ 5-6. Perri confirmed this arrangement with a letter to Mrs. Ragan. P-6.

Thereafter, Perri sent Mrs. Ragan letters explaining what was happening at key points in her son's cases. NT 58 (direct testimony of Mrs. Ragan), 72 (cross-examination testimony of Mrs. Ragan)[6]; FF ¶ 16. For example, on December 23, 1998, Perri informed her that he had moved for an extension of time to file a direct appeal in the death case. P-6. On April 1, 1999, Perri informed her that he had filed the appeal. P-11; FF ¶ 16. And on June 30, 1999, he informed her that the Pennsylvania Supreme Court two days earlier had denied re-argument of the life PCRA petition. P-12; FF ¶ 7. Perri --- not Mrs. Ragan --- initiated each communication. Mrs. Ragan periodically sent checks to Perri throughout the pendency of the state-court actions. FF ¶ 6; P-9; P-8.

"Soon after June 28, 1999," Mrs. Ragan met with Perri to discuss the possibility of filing a habeas petition in the life case. FF ¶ 8. On August 12, 1999, Mrs. Ragan met with Perri once again.

---

[4]  Mrs. Ragan has acted as her son's agent, pursuing his legal remedies while he has sat on death row.

[5]  "FF" refers to findings of fact in this Court's Order of September 7, 2007 (Doc. # 61), attached to this Memorandum and Order.

[6]  "NT" refers to notes of testimony given at the March 13, 2007 evidentiary hearing.

FF ¶ 9. Perri told Mrs. Ragan (by courtesy copy of a letter to Petitioner) that he would file the petition. P-2. Again, Mrs. Ragan and Perri agreed that she would pay Perri periodically via check. FF ¶ 15. Again, Perri confirmed this arrangement with a letter to Mrs. Ragan. P-2. And again, Mrs. Ragan periodically sent checks to Perri. P-8.

The terms of the habeas representation arrangement were functionally identical to the terms of the state-court representation arrangement. Therefore, Mrs. Ragan justifiably assumed that, as with the state-court representation, Perri would take the initiative and alert her via letter of significant events and deadlines in the habeas case. FF ¶ 16. Perri never filed a habeas petition and never told the Ragans he did not intend to file one. Id. ¶¶ 15-16.

On January 10, 2000, Mrs. Ragan faxed a letter to Perri asking for a status update on the habeas case. FF ¶ 20. She never heard back. Id. Frustrated with Perri's unresponsiveness, in "early 2000," Mrs. Ragan contacted the Federal Defenders of Philadelphia (the "Defenders") who told her that no habeas petition had been filed. Id. The Defenders agreed to take the case. Id. On February 7, 2000, they entered a formal appearance and filed a motion for leave to proceed in forma pauperis. P-1. On April 21, 2000, they filed the habeas petition at issue here (Doc. # 1). FF ¶¶ 21-22.

## II.     AEDPA statute of limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on habeas petitions filed by prisoners in state custody. 28 U.S.C. § 2244(d)(1). The one-year period begins to run on the latest of (1) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (2) the date on which the impediment to filing an application created by state action in violation of the

Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action; (3) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. § 2244(d)(1). However, if those dates all precede AEDPA's April 24, 1996 effective date, then the one-year period begins to run on April 24, 1996. Nara v. Frank, 264 F.3d 310, 315 (3d Cir. 2001).

The one-year period does not run inexorably without interruption. It may be statutorily tolled. AEDPA provides that the one-year period shall be tolled while "a properly filed application for state post-conviction or other collateral review [of the state judgment] is pending…" § 2244(d)(2). But, even when no such application is pending, a court may invoke its equitable powers and toll the period in sufficiently egregious circumstances.[7] More specifically, a court will toll the statute for a period of time during which (1) the petitioner was "pursuing his rights diligently" but (2) "some extraordinary circumstance" prevented the petitioner from bringing his claims. Lawrence, 127 S.Ct. at 1085; Taylor, 504 F.3d at 427.

---

[7] The U.S. Supreme Court has never affirmatively embraced or rejected equitable tolling, but the Court has accepted it when both parties assume that it is in theory available. Lawrence v. Florida, 127 S.Ct. 1079, 1086 (2007); Pace v. DiGuglielmo, 544 U.S. 408, 418 n.8 (2005). Respondents do not argue that equitable tolling is never available. Further, the Third Circuit has held that equitable tolling is permitted because the AEDPA statute of limitations is not jurisdictional. Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007).

**III.     Discussion**

On April 24, 1996, the statute of limitations began to run because Ragan's time for seeking certiorari in the U.S. Supreme Court expired before that date. Ragan therefore had 365 days --- until April 24, 1997 --- to file the petition. Beginning on April 25, 1996, 230 days passed with no activity in the case.

**A.     Statutory tolling from December 10, 1996 until June 28, 1999**

The AEDPA period is statutorily tolled during the pendency of a properly filed application for state post-conviction review. § 2244(d)(2). A PCRA petition qualifies as an application for state post-conviction review. Nara, 264 F.3d at 318. Once filed, it remains "pending" until the Pennsylvania Supreme Court denies re-argument. Id. at 319.

On December 10, 1996, Ragan filed a PCRA petition in the life case. Respondents do not argue that it was not properly filed. That petition was pending until June 28, 1999, the date on which the Pennsylvania Supreme Court denied a motion for re-argument. Forty-five days later, on August 12, 1999 --- with 90 days left on the statute of limitations --- she retained Perri to file a habeas petition.

**B.     Equitable tolling from August 12, 1999 until January 10, 2000**

As explained above, a court will equitably toll the AEDPA period while (1) Petitioner diligently attempted to bring his claims, but (2) "extraordinary circumstances" prevented him from doing so.

5

**1.     Diligence**

During the putative tolling period, Petitioner must have diligently attempted to bring his claims. This standard "does not require the maximum feasible diligence." Schlueter v. Varner, 384 F.3d 69, 77 (3d Cir. 2004). It only demands "reasonable" diligence under the circumstances. Id. This means that diligence is context-dependent; if two petitioners in different circumstances take identical steps in attempting to bring their claims, one might be deemed reasonably diligent while the other might not.

Ragan's diligent pursuit of federal relief began when his mother met with Perri on August 12, 1999, to retain him to file a habeas petition. By that point, the Ragans had developed a long and significant history with Perri. By December 23, 1998, Mrs. Ragan had formally engaged him to represent her son in state-court appellate proceedings in both the life and death cases. Mrs. Ragan would pay Perri periodically, and Perri would send Mrs. Ragan status updates regarding key events in her son's cases. Mrs. Ragan therefore had the perfectly reasonable belief that the habeas representation agreement would take substantially the same form: a confirmation letter, followed by periodic payments from Mrs. Ragan to Perri and periodic letters from Perri to Mrs. Ragan.

On August 12, 1999, Perri sent a confirmation letter reaffirming the habeas engagement. Mrs. Ragan continued to pay him periodically. Because Mrs. Ragan never received from Perri any letters explaining significant events and deadlines in the habeas representation, she justifiably concluded that no significant events or deadlines were looming on the horizon. After all, if any such deadlines had passed or any such events had transpired, Perri would have proactively taken the initiative to inform her just like he had done multiple times in the state-court representation.

But, Petitioner's diligence ended on January 10, 2000, when his mother faxed Perri a letter

inquiring about the status of the habeas petition and never heard back. This put Mrs. Ragan on notice that she had to take alternative steps in order to file the petition.

Respondents invoke Schlueter, a case where I found a lack of reasonable diligence and was affirmed by the Third Circuit, in an attempt to prove that Ragan was not reasonably diligent. However, the facts I found in Schlueter --- and therefore what types of diligence qualified as "reasonable" --- differ significantly from the facts in this case.

In that case, Schlueter was arrested in 1985 on a homicide charge. 384 F.3d at 71. He was represented by two public defenders. Id. At trial, Schlueter was found guilty and sentenced to life imprisonment in May 1987. Id. Based on his counsel's erroneous legal advice, he did not file a direct appeal. Id. In August 1988, he attempted to contact one of his trial counsel to inquire about filing a PCRA petition. Id. He never heard back. Id.

In June 1994, Schlueter's parents retained attorney Lauer to explore PCRA options.[8] 384 F.3d at 71. At that time, Schlueter was "fully aware" of his PCRA rights. Id. at 76 & n.11. As of November 9, 1996, Lauer never made any efforts to contact the Schlueters. Id. at 71. On November 10, 1996 --- more than two years after Lauer was retained --- Schlueter sent Lauer a letter informing Lauer that the Pennsylvania legislature had passed a law moving up the PCRA deadline in cases such as Schlueter's to January 16, 1997, less than two months away. Id. On December 2, 1996, Lauer wrote back and promised to file a petition before the end of the year. Id. He reiterated this promise in a subsequent letter on December 13, 1996. Id.

---

[8]   They also asked Lauer to represent Schlueter in civil wrongful-death proceedings related to the criminal action. 384 F.3d at 72.

Lauer never filed. 384 F.3d at 72. When Schlueter eventually filed a federal habeas petition, it was untimely. Id. at 73. But, had Lauer filed the PCRA petition by the end of 1996 as promised, the AEDPA limitations period would have (all else equal) been statutorily tolled long enough to make the habeas petition timely. Id. at 77.

On these facts, I held that Schlueter's and his parents' many efforts did not amount to reasonable diligence, and the Third Circuit affirmed. 384 F.3d at 76-78. However, the Schlueters' relationship with Lauer --- and therefore what level of diligence was "reasonable" --- was fundamentally different from the Ragans' relationship with Perri. Perri and Mrs. Ragan had a prior ongoing course of dealing characterized by Perri's consistent and regular practice of proactively initiating written communication. Lauer and the Schlueters never showed any prior course of dealing at all. And, during the representation at issue, Lauer never initiated communication.

Lauer, unlike Perri, never created an expectation that his client could reasonably depend upon him to provide status updates about significant events in the case. So, the Schlueters, unlike the Ragans, were not justified in concluding that their attorney's lack of communication meant everything was going according to plan. Indeed, the Schlueters, unlike the Ragans, felt the need to affirmatively reach out to their attorney and take the lead, going so far as to educate him on then-recent developments in Pennsylvania criminal procedure. Also, Schlueter was "fully aware" of the scope of his PCRA rights at the time he retained Lauer in 1994. In contrast, there has been no such exceptional finding in this case that Ragan could navigate the intricacies of post-conviction litigation. Rather, Ragan depended entirely on Perri. Ragan's reliance must therefore be judged against this backdrop. Simply put, any assessment of Schlueter's diligence does not impugn my assessment of Ragan's.

**2.      Extraordinary circumstances**

To constitute extraordinary circumstances, attorney misconduct must be "egregious." Schlueter, 384 F.3d at 77. Respondents characterize Perri's conduct as a single passive error: the failure to file a habeas petition. Resp'ts' Resp. Mem. (Doc. # 72) 2-4. This view is myopic.

For nearly eight months, Perri created a culture of reliance, inducing Mrs. Ragan to depend upon his periodic letters for vital case information and therefore causing her to believe that the absence of such letters indicated the absence of such information. But, when Mrs. Ragan met with Perri on August 12, 1999, Perri unilaterally and covertly changed the rules in the middle of the game. Perri silently shifted the burden of communication to Mrs. Ragan, never affirmatively telling her that he was not planning on filing the habeas petition, and never suggesting she pursue habeas remedies with other counsel. Perri's ultimate failure to file the habeas petition was unquestionably the coup de grace in his saga of abandonment, but it was by no means the entirety of it. It is hard to imagine more egregious malfeasance.

Respondents cite Schlueter to argue that Perri's malfeasance does not constitute extraordinary circumstances. That case does not support this proposition. As I have already stated in the diligence discussion, the attorney neglect in Schlueter was nowhere near as dramatic and widespread as it is here. There, the attorney merely failed to file a habeas corpus petition. Here, by contrast, Perri's failure to file a habeas petition was merely the final betrayal. Before that, Perri breached the Ragans' trust by unilaterally altering the contours of their attorney-client relationship and eviscerating the

9

value of Mrs. Ragan's reliance on her and Perri's prior course of dealing.[9] Additionally, Ragan's lack of knowledge of federal habeas litigation makes Perri's abandonment more extraordinary, just as it made Ragan's reliance more reasonable. Schlueter's demonstrated knowledge of PCRA litigation suggested that Schlueter could fend for himself if necessary, or at least that he could conduct an educated search for substitute counsel. However, Ragan communicated to Perri no such mastery. Without Perri, Ragan was lost.

Further, while the Third Circuit may be growing less inclined to allow a capital defendant to toll the statute based upon a showing of "less than 'extraordinary circumstances,'" the Circuit has not held that a client's impending execution is factually irrelevant to determining when attorney abandonment is "extraordinary."[10] Indeed, it would defy common sense to ignore the fact that

---

[9] Respondents' two district court cases on "extraordinary circumstances" are similarly unavailing. Ceo v. Klem 04-3291, 2005 U.S. Dist. LEXIS 45588 (E.D. Pa. Aug. 31, 2005) (Report & Recommendation), adopted in 07-3177, 2006 U.S. Dist. LEXIS 96905 (E.D. Pa. Jan. 20, 2006) (mis-stating Fahy as holding that attorney error never can constitute --- rather than simply that attorney error as of date of Fahy decision never has constituted --- an extraordinary circumstances); Shelley v. Filino, 04-2510, 2005 U.S. Dist. LEXIS 3150 (E.D. Pa. Feb. 25, 2005) (concerning attorney's failure to reveal contents of court order --- a matter of public record --- rather than attorney's failure to reveal status of preparation of federal habeas petition, which is privileged work-product).

[10] Because the life conviction is the sole aggravating factor underlying Ragan's death sentence, I am inclined to treat this as a capital case. But, it is not clear whether this distinction would change the tolling test.
 In Fahy, the Third Circuit allowed a capital petitioner to equitably toll the statute upon a showing of circumstances that were "less than 'extraordinary.'" 240 F.3d at 245. However, after Fahy, the Supreme Court in Lawrence required a capital petitioner to demonstrate "extraordinary" circumstances. 127 S. Ct. at 1085. This might be read to overrule Fahy and make the capital standard equal with the non-capital standard requiring "extraordinary circumstances." But, the Court in Lawrence actually found extraordinary circumstances; the strength of the standard did not decide that case. The Third Circuit's most recent post-Lawrence capital case, Taylor, did not resolve the question. It held that extraordinary circumstances toll the statute, but so might "other reasons." 504 F.3d at 427.
 In any event, because I hold that Petitioner has equitably tolled the statute under the Lawrence standard, my analysis would apply a fortiori under a more relaxed standard.

10

abandoning a client facing execution is immensely more egregious than abandoning a client facing, say, a term of years in prison or a monetary fine. Put another way, because Ragan was (and is) facing the death penalty, Perri's abandonment detailed above becomes even more heinous.

Petitioner was reasonably diligent in attempting to file his habeas petition from August 12, 1999 until January 10, 2000. But, extraordinary circumstances stood in his way during that time. Therefore, the AEDPA statute was equitably tolled. At that point, Ragan had 90 days in which to file a federal application.

### III.    Conclusion

Mrs. Ragan reached out to the Defenders in "early 2000" and asked them to take her son's case. They agreed, and on February 7, 2000, they entered an appearance and filed a motion for leave to proceed in forma pauperis. Therefore, the petition officially filed on April 21, 2000, relates back to February 7, 2000. See Crews v. Horn, 360 F.3d 146, 149-150 (3d Cir. 2004) (using filing date of pending motion to proceed in forma pauperis as filing date of petition itself for AEDPA statute-of-limitations analysis).  That is, the application for habeas is deemed filed February 7, 2000. At this point, Ragan still had 62 days in which to file. Therefore, the application is timely.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| DERRICK G. RAGAN, | : | |
|     Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 00-2092 |
| | : | |
| MARTIN HORN, et al., | : | |
|     Respondents. | : | |
| | : | |

## **ORDER**

     **AND NOW**, this __6th___ day of March, 2008, I find that the Petition for Writ of Habeas Corpus (Doc. # 1) is **TIMELY**.

                                        s/Anita B. Brody
                                        _____
                                        ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK G. RAGAN, | : | |
|     Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 00-2092 |
| | : | |
| MARTIN HORN, et al., | : | |
|     Respondents. | : | |

**MEMORANDUM AND ORDER**
(*** originally issued as Doc. # 61 ***)

**MEMORANDUM**

Background

Petitioner Derrick G. Ragan ("petitioner") was convicted of two homicides in Pennsylvania state court. For the first conviction, petitioner was sentenced to life in prison (the "life" case). For the second conviction, petitioner was sentenced to death (the "capital" case). Petitioner's conviction in the life case was the sole aggravating factor underlying his death sentence in the capital case. Petitioner filed a separate PCRA petition challenging each homicide conviction. On April 21, 2000, petitioner, through his counsel at the Federal Defenders Association ("Defenders"), filed a petition for writ of habeas corpus in this Court, challenging his conviction in the life case. His petition was filed after the statute of limitations provided by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") had expired. Petitioner contends that he is entitled to equitable tolling because his previous attorney abandoned him.

Petitioner requested an evidentiary hearing, and on March 13, 2007, I held an evidentiary hearing. Petitioner called three witnesses: Mr. Fortunato Perri, Esq., who represented petitioner

on various matters relating to petitioner's criminal convictions; Mrs. Inez Ragan ("Mrs. Ragan"), his mother; and Mrs. Verna Ragan ("Verna Ragan"), his sister-in-law who is married to petitioner's brother.   The respondents presented no witnesses.

Based on the evidence heard at the hearing and exhibits submitted, I make the following findings of fact:

### Findings of Fact

1. On December 23, 1998, by the time petitioner's conviction in the life case had already been affirmed by the Pennsylvania Superior Court, the Ragan family retained Mr. Fortunato Perri, Esq., to represent petitioner relating to petitioner's criminal convictions on both the life case and the capital case.  The Ragan family retained Mr. Perri to file an allocatur petition to the Pennsylvania Supreme Court on the life case and a direct appeal in the Pennsylvania Supreme Court on the capital case.

2. Mr. Perri prepared a fee agreement to represent petitioner in both the life case and the capital case.  It is unclear whether he prepared two separate retainer agreements or just one.

3. Mr. Perri charged Mrs. Ragan "in the neighborhood" of $10,000 per case, for a total of $20,000.

4. Mr. Perri had an arrangement with Mrs. Ragan that she could pay in installments. This meant that she would not be required to pay the full amount prior to his filing the briefs – not an

unusual arrangement for Mr. Perri.

5.      Mrs. Ragan worked for the School District of Philadelphia and also owned a family business, a bar/restaurant. When they had extra money, the Ragans brought it to Mr. Perri. The Ragan family could not pay for Mr. Perri's services in one lump sum. The Ragans made payments every four to six weeks, and each of these payments was on the order of "two thousand, three thousand, a thousand, whatever [they] had."

6.      Mr. Perri received payments from the Ragans in "some combination" of both checks and cash.[1]  There was no set amount that Mr. Perri would expect to receive on a monthly basis.

7.      Mr. Perri filed the allocatur petition on the life case to the Pennsylvania Supreme Court. On April 20, 1999, the petition was denied. Mr. Perri subsequently filed a petition for re-argument that was denied on June 28, 1999.

---

[1] When the Ragans initially retained Mr. Perri in December 1998, Mrs. Ragan paid Mr. Perri $4,000. Mrs. Ragan wrote checks to Mr. Perri, and these checks were cashed by his law firm, McMonagle, Perri & McHugh. The checks totaled $9,000.
    In addition to the $13,000 paid by Mrs. Ragan, Verna Ragan, petitioner's sister-in-law, also contributed to petitioner's representation. Verna Ragan withdrew from her account amounts of $2,000 (12/15/98), $1,000 (1/4/99) and $2,000 (1/5/99) to pay Mr. Perri for petitioner's representation. She withdrew money on consecutive days -- January 4, 1999, and January 5, 1999 – at the behest of her husband, who wanted to pay Mr. Perri as much as possible at one time. Verna Ragan paid Mr. Perri roughly $4,000 to $5,000 after winning $5,000 at the slot machines during a trip to Atlantic City.

8.      Soon after June 28, 1999, the date on which the Pennsylvania Supreme Court denied the petition for re-argument, Mr. Perri and Mrs. Ragan discussed the filing of a federal habeas petition.

9.      On August 12, 1999, Mr. Perri prepared another retainer agreement for petitioner and Mrs. Ragan.  The retainer agreement contained "boilerplate" language used by Mr. Perri.  For example, the retainer stated that "all legal fees are due before the first day counsel appears in court for you, unless otherwise agreed."  Mr. Perri was informal and imprecise about the terms and conditions of his agreements.[2]

10.     Mrs. Ragan signed the retainer agreement in Mr. Perri's office on August 12, 1999, the date it was drafted.  Mr. Perri gave her a copy.

11.     On August 12, 1999, the same day that Mr. Perri prepared the retainer agreement, he sent a letter to petitioner that stated:

> Our next step is to file a Federal Habeas Petition in the Eastern District of Pennsylvania.  In that petition, which must be filed within one year from the exhaustion of your State Court Appeals, [you] must allege a federal question.  I feel that your case contains the required issues to proceed in the Federal Court.
>
> I have discussed this matter with your mother and brother and we've worked out fee arrangements.  We will prepare the petition and file it on your behalf.

---

[2] Mr. Perri testified that "that [language] probably should have been taken out of that fee agreement before it was sent out," because in cases when Mr. Perri was retained for appellate or habeas corpus proceedings, he might not ever appear in court for the client

16

12. On August 12, 1999, Mr. Perri undertook the representation of petitioner to file a habeas petition on the life case.

13. Mrs. Ragan immediately confirmed this understanding of the retainer agreement with petitioner.

14. Mr. Perri understood that filing petitioner's habeas petition would require determining the due date, and he understood how to calculate that date. Mr. Perri knew that certain periods of time would be counted against petitioner, and with respect to calculating the due date, Mr. Perri knew "what needed to be done."

15. The Ragans were paying Mr. Perri over time to represent petitioner on the habeas petition in this case, just as he had been paid over time for the state court litigation  The prior, existing arrangement between Mr. Perri and the Ragan family was to continue through Mr. Perri's service on the federal habeas petition, which was never rendered.

16. Mrs. Ragan never received a letter from Mr. Perri saying that he was withdrawing from the case, or that he sought to alter the existing fee payment arrangements. Mr. Perri consistently corresponded with Mrs. Ragan about his representation of petitioner. For example, Mr. Perri copied Mrs. Ragan on his letter to petitioner, indicating that he would file a habeas petition on petitioner's behalf in the life case. Also, in the course of his correspondence with Mrs. Ragan

17

about his representation of petitioner, Mr. Perri mentioned "the Brief for Appellant filed with the Supreme Court on March 31, 1999," referring to petitioner's direct appeal in the capital case. Thus, Mrs. Ragan had every reason to believe that Mr. Perri was representing petitioner and would be filing his federal habeas petition.

17.     Mrs. Ragan spoke with and visited petitioner regularly. Mrs. Ragan and petitioner spoke on the telephone twice weekly and visited with each other once every two weeks in the prison where petitioner is incarcerated. Petitioner shared Mrs. Ragan's understanding regarding Mr. Perri's representation.

18.     On December 22, 1999, the Pennsylvania Supreme Court denied petitioner's capital appeal, that Mr. Perri had filed.  Mrs. Ragan met with Mr. Perri shortly thereafter – before the beginning of 2000 – but they did not discuss the life case.  During their meeting, Mr. Perri suggested that Mrs. Ragan contact the Defenders because of their expertise in dealing with federal capital habeas proceedings.

19.     When Mrs. Ragan called the Defenders, they notified her that petitioner himself had to contact them for help.  Petitioner sent a letter to the Defenders dated January 10, 2000.

20.     On January 10, 2000, Mrs. Ragan faxed an inquiry to Mr. Perri regarding the status of petitioner's habeas petition in the life case.  She wrote: "Would you please tell us what stage Derrick's first case is at in the court at this time?"  In parentheses, she wrote the name "Anthony

18

Thomas," the victim of the homicide for which petitioner was sentenced to life in prison. Mrs. Ragan never received a response to her inquiry, but she learned from the Defenders in early 2000 that the statute of limitations for filing the habeas on the life case had expired, and no habeas petition had been filed.

21. The Defenders Capital Habeas Unit entered an appearance on February 7, 2000.

22. The federal habeas petition on the life case was filed on April 21, 2000.

## ORDER

**AND NOW**, on this _7th_ day of September, 2007, it is hereby **ORDERED** that the parties submit briefs to the Court, concerning the equitable tolling issue, using the Findings of Fact numbered 1 through 22 included in this Memorandum and Order.

Petitioner shall submit his brief by September 27, 2007. Respondents shall then submit a brief in opposition by October 16, 2007. Petitioner may submit a reply brief by October 23, 2007.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

O:\ABB 2008\L - Z\ragan habeas equitable tolling timely pet'n.wpd